In this case number 418-0155, in re A.D., and for the appellant, we have Ms. Blackburn, and for the appellee, we have Mr. Escalera. You may proceed, counsel. May it please the court, counsel. We are before this court today asking that the orders of the trial court finding that Audrey Davis was an unfit parent, and that it was in the best interest of her son that her rights be terminated, be reversed, as those findings by the trial court were against the manifest weight of the evidence that was presented at trial in this case. While I am aware that the court is acquainted with the facts behind this case, there are some facts that I believe need to be pointed out by the court, because they are important as to the timeline of how this case proceeded. With regard to this case, following a criminal complaint being filed against Audrey Davis, the state of Illinois filed a petition for shelter care on January 26th of 2015. That criminal complaint related to a foster child that was in Ms. Davis' care and did not involve Ms. Davis' son, who is the subject of this appeal. But the shelter care was filed, including him as well, because of the substantial risk of physical abuse, because Audrey had inflicted excessive corporal punishment upon one of the foster children who was a minor. It is important to note that throughout this case and throughout all of the investigations, there was never an allegation that Audrey had ever harmed her son that is the subject of this petition. Shelter care was ordered on January 28th, 2015, and then the case proceeded for 16 months before we came to adjudication. During that 16 months and by the time we got to adjudication, Audrey had completed most of the services in her service plan that was laid out initially when the children were brought into care. Including by the time that we got to adjudication, Audrey had already pled guilty to aggravated battery of a child related to that criminal complaint involving the foster child. Approximately a month after that, a dispositional order was entered granting custody and guardianship of Audrey's son to the state, and then less than a year later, this motion to terminate Audrey's parental rights was filed, alleging that Audrey was unfit due to failing to maintain a reasonable degree of interest, concern, or responsibility for her son's welfare, failing to make reasonable efforts to correct the conditions that brought her son into care, and failing to make reasonable progress towards his return home within nine months of adjudication. According to my calculation, that nine months after adjudication would have been June 2016 until March of 2017, and then we came to hearing on March 2nd of 2018 for a hearing on termination of parental rights and a finding of unfitness, all of which was granted after several days of hearing and a lot of testimony from witnesses called by the state in this case. Your Honors, first, with regard to the allegation that Audrey failed to maintain a reasonable degree of interest, concern, or responsibility for her son's welfare, the evidence simply just does not support that allegation. The evidence that was presented to the court was that Audrey always visited with her son, except during the period that she was incarcerated as a result of that criminal complaint, which was November of 2015 until April of 2016, that she repeatedly requested additional time with her son, and that those requests were never granted. So this is a reasonable enough argument, but as you know, the trial court made several findings. Reasonable offense was just one of them, but the court also found that your client failed to make reasonable progress towards the return. Reasonable progress, I think, is an easier thing to assess, because then we're talking about not a subjective standard like one's reasonable efforts. Reasonable progress is a standard which can be evaluated, and the trial court found she did not make reasonable progress. Why wasn't the court correct in so finding? Well, Your Honor, the court was not correct in so finding because there was a plethora of evidence presented to the court about all of the things that Audrey had done from the point that these children came into care until, and frankly, right up until the time of trial. She had been through parenting classes. She had evidenced parenting skills that she had learned in those classes during her visits with her son, which of course were monitored by Family Service Center. She had a mental health assessment done. That mental health assessment wanted her to have a psychological evaluation done. She did the psychological evaluation. As a result of her plea in criminal court, she was to do a substance abuse evaluation, which she did. She was to take anger management classes, which she did. She successfully completed all of those things, in fact, going above and beyond what Family Service Center ever asked her to do. Family Service Center asked her to take the parenting classes that they offered. She took those classes, and then she went and took additional classes at the parent place. As part of the parent place's program, they provided a parent mentor to her, or parent coach, I think they called it, to her that helped to coach her through some of the issues that she might be having in her parenting and understanding things that were appropriate and were not appropriate when it came to dealing with issues that arose with her children. She was making reasonable progress. I think where the court and, frankly, where Family Service Center got caught up in evaluating the progress that she was making was when it came to this mental health assessment and this subsequent psychological evaluation that was done. Your Honor, the initial assessment was done and indicated that she had parent-child relational concerns. I believe that was the diagnosis. Something to that effect, and then indicated that there were these two things called rule-outs. Rule-outs being the factitious disorder by proxy, which we all used to refer to as Munchausen by proxy, and this narcissistic personality disorder. When asked, the original evaluator, when she was asked, why did you put those rule-outs in there if you could not include those as actual diagnosis, and she indicated she didn't know why she put them in there, but she put them in there as part of her initial evaluation. That created a snowball effect that then got down to Ms. McKenzie, or I believe it's Dr. McKenzie, who did the actual psychological evaluation. Dr. McKenzie is the only person out of the five professionals that Ms. Davis saw who actually diagnosed her with narcissistic personality disorder and factitious disorder by proxy. The reason that that is important is because Family Service Center and DCFS seem to have blinders on from that point forward about what they believed Audrey was capable of doing. They all of a sudden believe now that Audrey was not capable of fully engaging in counseling, that she was not capable of taking responsibility for what she had done to the foster child. Counsel, wasn't that really an issue from the beginning and throughout the case? You talk about what she completed, but of course we all are familiar with those types of cases where perhaps a parent is completing things, but they're not engaging. They're not exhibiting that they're learning. They're not working on the issues that have been identified. They're just going through the motions, so to speak. Right, and I would agree with that except for the fact that in Audrey's counseling sessions with her counselor, I believe it was Nicole List, Ms. List indicated in the counseling that they were doing, while she did not believe Audrey was fully engaged at that point in the year time frame, I think 13-month time frame that she counseled with her, she felt that some of that was due to the fact that she had certain personality characteristics while not narcissistic personality disorder. She had certain personality characteristics that were preventing her from being able to fully engage. She did not indicate that she wasn't engaged. She did not indicate that they were not discussing the reasons why the children came into care or what Audrey needed to do in order to get this child back in her care, just that she was not fully engaged. And I don't think that the standard of being fully engaged is the same as the standard of making reasonable progress towards returning your child home. What about the sex offender risk assessment? Right. With regard to the sex offender risk assessment, that assessment was not done. As indicated in my brief, Audrey was reluctant to do a sex offender. She refused to do that. She did refuse to do a sex offender risk assessment. And her reasons for not wanting to do that was because what had happened, well, a couple of things. One, at the time that this motion to terminate her parental rights was filed, she was still under appeal. She was still in the process of the administrative appeal with DCFS, and then she subsequently appealed to the trial court to have that administrative finding overturned. That was not completed until, I believe, November of 2017, so well outside of this nine-month period that the court was evaluating and determining whether or not to terminate her parental rights. And in addition to that, she felt like the timing of this allegation against her was incredibly suspect. She had not had these children in her care for well over a year before these allegations were ever even made. And frankly, bottom line is, she was very concerned based on what had happened in the mental health assessment and everything that had come out of it, that she was going to be starting over from ground zero when this sex offender assessment was done. And she feared that there was going to be a whole new plethora, frankly, of services she was going to have to engage in before they would return her son home. And he had already been, of course, out of her care at that point for well over three years. And so she had some very significant concerns about this sex offender risk assessment being performed, who was going to be performing it, and what the outcome of that was going to be. Now, frankly, should she have done it? Possibly she should have went ahead and done it. But like I said, until this appeal process was over in the trial court, it did not seem like something that she should be proceeding forward with, not knowing whether or not the trial court was going to say that that finding was not consistent with a finding of sex abuse of a child. But she was given the usual admonishments that you must cooperate with the Department of Children and Family Services, comply with what they ask, or you risk losing your parental rights, you risk termination, right? I was not trial counsel, but I presume based on the record I've seen, yes. She was repeatedly given those admonishments. Now, with regard to her, the other allegation being the failure to make reasonable efforts to correct the conditions, the condition that brought the child into care was the state's concern that because of the physical abuse allegation against her by the foster child, that he was at substantial risk of harm for physical abuse himself. And again, as I already have stated, she went through all of the steps and all of the processes that she was required to go through to correct those conditions. Anger management counseling, substance abuse assessment, parenting classes, showing that she could use the skills that she learned in her parenting classes, including and very importantly, Ms. List, who was her counselor just before coming to hearing, indicating that she had no concern about whether or not Audrey would be able to utilize the skills that she learned in those parenting classes in actually parenting her son going forward. So she definitely made reasonable efforts to correct the conditions. I understand what the court is saying about the sex offender assessment, but I think her concerns about that sex offender assessment and completing it during that period of time are very well founded by her. And again, I would remind the court that the adjudication period we're talking about is an adjudication period prior to. Was all of this presented to the trial court? Again, Your Honor, I was not trial counsel. What does the record show? We rely on trial courts to use good sense and judgment. We have an experienced trial judge in this case, and we're essentially arguing a reason to excuse this conduct. What did the trial judge say about it? Well, the only reference to the sex offender assessment that I saw in the transcript was that she was asked whether or not she had done it. Her answer was no. She was asked by the guardian ad litem whether or not she would be willing to do it. And again, her answer was no. Why aren't those factors which the trial court could properly consider? Well, for one thing, I believe because they were outside of the time frame that we were referring to here. I mean, if she's still under appeal on those exact allegations with not only administratively with DCFS but then subsequently over with the trial court, I don't know that the trial court can consider something that is still ongoing and has not yet been fully resolved. Do you have a cite to a case that stands for that proposition? I do not, Your Honor. Now, I know this child is not a party to the appeal, but your client also had a daughter and the initial petition involved allegations of abuse with respect to that child, her child, right? That is my understanding, yes, Your Honor. And that, again, my understanding is that that matter is being handled by the family court now because the case was taken out of the purview of the juvenile court because of the father taking the child in that case. So her rights have not been terminated with regard to that child. And Ms. Blackburn? Yes, Your Honor. I was confused about one thing in the brief. You mentioned presumably the nine-month period was June 2016 through March 2017. Didn't the petition specifically allege the nine-month period that they were referring to? Yes, I believe it did, and I don't have the petition in front of me, but I believe that's the time period in which it alleged. And, Your Honor, in this case, as I have said, you know, it is my opinion, it is Audrey's opinion that she has done the things that she knew that she needed to do. When DCFS came to her and said, you're not fully engaged in counseling, you're not owning up to the abuse that you inflicted upon the foster children, you know, her response was, what more do you want me to do? I'm doing everything that you asked me to do. I pled guilty in criminal court. I pled to the or stipulated to the adjudication in the juvenile court. I don't know how many other ways I can say that I acknowledge that I went overboard with corporal punishment with this foster child. So what more they wanted from her as far as an acknowledgment that what she had done was not appropriate was unclear and frankly remains unclear to her. The same thing with the engaging in counseling. As far as Audrey is concerned, she was fully engaged in counseling, always in counseling, never a period of time while this was going on was she ever not engaged in some sort of counseling. And initially with Family Service Center, two different counselors there, and she felt like having Family Service Center handling the juvenile case and also handling her counseling, she was not making any progress in counseling. So she went outside of Family Service Center, sought out her own. Didn't she make certain accusations against the people in the Family Service Center, and so then they wound up sending her somewhere else, or she went somewhere else? She went somewhere else.  Because she made allegations against some of the people. Family Service Center refused to investigate those allegations and simply assigned her to another counselor. She did not believe she was going to be able to get a fair shake or not be judged prematurely by that second counselor, and so she made the decision to leave Family Service Center and go seek other counseling. Isn't that kind of the common theme throughout all of the various counselors and therapists who testified, was that your client kind of wanted to set the rules or the boundaries by which she was going to participate. She was only going to give this much information. She would not answer questions that were relevant to her background or history. She would not provide information when requested if she didn't think that that information was appropriate, and she would participate up to a point. But at a certain point then, her participation simply became showing up. Isn't that kind of the theme that ran through many of the counselors' testimony? There were concerns about those things brought forward by several of the counselors. I think the one counselor who indicated she had made more progress than any of the other counselors was Ms. List, who, like I said, she was with for approximately 13 months of time and regularly seeing her. I mean, frankly, the first two counselors that she was with, she was with for such a brief period of time, you know, they couldn't even have gotten to, and I believe one of them even testified to this, that, you know, it didn't surprise her that they hadn't made any progress because they hadn't really been together long enough, and I think it was four sessions. Four sessions wasn't enough time to even establish a relationship with somebody, much less make progress going forward on trying to resolve what were a number of issues that were going on at the time. But even at the end, Ms. List characterized her client as still remaining guarded when it came to discussing the events that led to the treatment. That is accurate. She seemed to have difficulty accepting responsibility. That is accurate. That is Ms. List's opinion. And, again, you know, my client believed she was being as forthcoming as she had the ability to be, and I believe Ms. List is the one who actually recognized that there may be some personality characteristics that are preventing her from being able, at that point, to be more engaging in the process that was going on. Now, Your Honors, bottom line is I believe it's against the manifest weight of the evidence for this trial court to find that reasonable efforts were not being made. As I indicated, she was always engaged and always completing services throughout this three-year-long journey that she had been on, and she had regularly been making efforts to do what she could to correct the conditions, including learning things in parenting class and through anger management counseling. And, therefore, we believe that it is against the manifest weight of the evidence for this court to have found her unfit and terminated her parental rights. Thank you. Thank you, Counsel. Mr. Escalera. May it please the Court, Counsel. Good afternoon, Your Honors. I am Rosario Escalera, and I represent the State in this matter. In this child termination case, Your Honors, the respondent argues she made reasonable progress toward the goal of returning A.D. to her care because she has gone above the minimum or demonstrated movement when she completed the majority of the services. Now, while the respondent correctly states the standard, this court, in which Justice Steigman authored the opinion in the interest of LLS, noted that the court will be able to order the child returned to parental custody in the near future because, at that point, the parent will have fully complied with the directives previously given to the parent in order to gain custody of that child. Now, here, that simply is just not the case because, as Your Honors have correctly noted, that respondent did not engage in counseling and she did not complete the sex offender assessment. Now, as has already been mentioned, she completely refused to complete the sex offender assessment. Now, regarding the sex offender assessment, the two children that allege these allegations, E.D. and S.W., they allege that they were physically abused by a respondent from March 2014 to January 2015, which was probably because they were moved from her care already, and that's when they allege those allegations. Now, as for the counseling, the evidence clearly demonstrates that the respondent did not make, or at least made slight progress and did not engage in this counseling. Now, even though she did go to counseling, the respondent did not apply anything that she learned. Now, while she did complete the majority of her services, the progress was not of such quality that E.D. could be returned to respondent's care. Indeed, the issue is not respondent's parenting, but with respondent's behavior and the risk towards E.D. and any abuse that he could have sustained. Now, these small service goals will not change respondent's behavior with their children. Now, as for reasonable efforts and the reasonable degree of responsibility, these are lower, not lower standards, but the one with a subjective standard, while the reasonable progress is a objective standard. And with regarding the objective standard, just completely refusing to do that is not objectable. Now, because the state, now here the state proved by clearly convincing evidence that respondent was in fits. Therefore, this court now must consider the best interest in this case. And it was clearly in E.D.'s best interest that respondent's parental rights be terminated. First is because E.D. was placed with the Duffners, and the Duffners have provided everything basically for E.D. Evidence clearly showed that E.D. has thrived in his new house, and all of his needs are being met, and then there's testimony that E.D. would suffer no harm if he were removed from, or if respondent's parental rights were terminated. Perhaps if there's no issue being raised about best interest, the issue being raised here is about whether or not the finding of unfitness was appropriate. Correct, yes, Your Honor. Or maybe I misunderstood the termination. The respondent briefly argues best interest at the end, so that's why the state is contending. Okay, then I am incorrect. Okay, so that's why we're arguing that brief part. So, and then conversely, Your Honors, E.D. cannot be returned to respondent's care because she completely refused to do the sex offender assessment. There's just a potential danger that E.D. could be exposed to if he was returned to respondent's care. And for those reasons, the state would ask that this court affirm. Are there no further questions? I don't see any at this time. Thank you, Counsel. Any rebuttal, Ms. Blackburn? I would only like to point out two things on rebuttal. The first one is contrary to what the state has indicated, the state indicated that she did not apply anything that she had learned in her parenting classes or anger management classes that she took. But no one of the witnesses of the nine witnesses that testified before the trial court indicated that they believed that she was not applying the things that she had learned in her parenting classes and anger management classes in dealing with or in participating in visitation with her child. And the only other thing that I would indicate, again, in that case, NRELLS, the court indicated that minimally reasonable progress requires measurable or demonstrable movement toward the goal of reunification. Not completion of a service plan, but just movement towards the goal. And it is my opinion and it is Audrey's opinion that she has made movement towards the goal of reunification throughout the three years that this child was in care. Thank you. Thank you, Counsel. This matter will be taken under advisement. We'll be in recess until the next case.